IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PREFERENTIAL NETWORKS IP, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Civil Action No. 2:16-cv-01374 |
| | § | |
| AT&T MOBILITY, LLC D/B/A AT&T | § | |
| MOBILITY, AT&T MOBILITY II LLC D/B/A | § | JURY TRIAL DEMANDED |
| AT&T MOBILITY, NEW CINGULAR | § | |
| WIRELESS SERVICES, INC. D/B/A AT&T | § | |
| MOBILITY, and CRICKET WIRELESS LLC, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S RESPONSE TO AT&TS' MOTION TO DISMISS UNDER RULE 12(B)(6) OR, ALTERNATIVELY, UNDER RULE 12(B)(3)

Plaintiff, Preferential Networks IP, LLC ("PrefNet" or "Plaintiff") submits this Response to the above-styled Motion to Dismiss (Doc. 19) filed by AT&Ts ("AT&T"), as follows:

## I.    INTRODUCTION

PrefNet's Amended Complaint[1] contains enough facts to state a claim that is plausible on its face. AT&T has not met its high burden at the pleadings stage of overcoming the presumption of validity and proving by clear and convincing evidence that any, and certainly not all, of the '994 claims are directed to an ineligible abstract idea, including without additional meaningful limitations, or that PrefNet has not plead a plausible claim for willfulness or enhanced damages. Likewise, AT&T has not met its high burden at the pleadings stage of overcoming the presumption of validity and proving by clear and convincing evidence, with mere unsworn argument, that the claim limitations are somehow routine, well-understood, conventional, generic, existing, commonly used, well known, previously known, typical, and the like, including when viewed by one of ordinary skill in the art as of the April 18, 2000 priority date for the '994 patent. Without limitation, the inventors, among other things, made use of existing hardware and network protocols to solve specific problems in networking technology and improve networking functionality to such an extent that, many years later, use of the patented technology eventually has become common among, *inter alia*, cellular providers and ISPs.

AT&T's Motion is premised upon an over-simplified, faulty interpretation of the claims, which ignores the specification of the patent, and the language and limitations of the claims themselves, and concludes that the claims are directed towards nothing more than "slowing a delivery by delaying a portion of the delivery, based, in part, on the deliveries that have occurred in the past." Mtn. at p. 6. However, AT&T has, if anything, merely described how prior art of record works. The '994 claims

---

[1] AT&T's Motion is directed to PrefNet's Original Complaint (Doc. 1). Prior to the filing of this Response, PrefNet amended its complaint as permitted by FRCP 15(a)(1). Doc. No. 21 (the "AmendComp"). The amendment includes substantial revisions to LSIP's willfulness allegations which, at a minimum, render moot the willfulness/enhanced damages arguments raised in the Motion. To the extent it remains necessary to respond to the Motion in view of the Amended Complaint, PrefNet does so herein.

were allowed because they are novel over the prior art. Further, even if the Court deems the purpose of the invention set forth in the '994 patent to be abstract (which it is not), there is undeniably an inventive concept that appropriately limits the claims, including the novel functionality noted herein.

The claimed inventions of the '994 patent cover far beyond, and are far more specific, than AT&T's oversimplified mischaracterization. AT&T cannot credibly argue there is an analogous practice as the claimed invention that existed prior to computers or networking. Even after computers and networking had become commonplace, the prosecution history noted herein demonstrates that substantially different types of alleged throttling based upon prior transmissions (*e.g.*, Kalkunte based upon traffic collisions and Danneels based upon on expected user processing time) was done, but such prior art systems and processes employed, inter alia, substantially different techniques to address substantially different problems and achieve substantially different results.

Furthermore, and in the alternative, if the Court deems that a § 101 challenge is appropriate in this case, genuine issues of material fact exist—such as, for example, whether the claimed invention was well known, routine, conventional, etc. over sixteen years ago at the time of the invention; whether the software and hardware that implement the claimed system were generic as alleged, and whether the claims preempt any abstract ideas—that preclude granting a Rule 12(b) Motion, especially at this early stage. At a minimum, a decision on a motion to dismiss on the pleadings is inappropriate when there are factual disputes to be resolved, including regarding whether the '994 claims have meaningful limitations and/or inventive concepts based upon the state of the art over sixteen years ago, and including whether, at that time, the claimed limitations were routine, well-understood, conventional, generic, existing, commonly used, well known, previously known, typical, and the like over sixteen years ago. Therefore, AT&T's Motion should be denied or—at the very least, and in the alternative—stayed pending the Court's claim construction,[2] when the Court could

---

[2] See Doc. No. 20-1, part II, pp. 4-6, which explains, at least in part, why claim construction is necessary before

at least get a better sense of the technology and also resolve, at least in part, the parties' widely different views about the scope and import of the patent claims. AT&T's 101 Motion should also be denied because the claims are not preemptive of abstract ideas.

In short, including when viewed properly as a whole, the claims are not abstract; they constitute a concrete application of improved computer technology; and they have novel, meaningful, and significant limitations which preclude any finding of unpatentability. Finally, AT&T's now moot Motion to Dismiss PrefNet's willfulness and enhanced damages allegations should be denied, including because PrefNet's Amended Complaint has sufficient facts to state a plausible claim.

## II.    FACTUAL BACKGROUND

### A.    The '994 patent-in-suit.

The patent-in-suit, U.S. patent no. 8,732,994 (the '994 patent") (Exh. 2), is one of many patents by named inventor, Gary Schuster, involving computer and network technologies. The application for the '994 Patent is part of a chain of continuation applications dating back to non-provisional application no. 09/837,319, filed on April 18, 2001 (the "'319 application") (Exh. 3), and to provisional application no. 60/198,491, filed on April 18, 2000. Claim 1 of the '994 Patent, the only claim even arguably meaningfully addressed in AT&T's Motion,[3] covers the following:

> A method, comprising: receiving, at a first computer system, information indicating a request to transfer data to a second computer system; the first computer system determining a quantity of other data previously transferred to the second computer system; and in response to said determining, the first computer system throttling transfer of the data to the second computer system, wherein the throttling is based at least in part on the determined quantity of other data previously transferred to the second computer system and comprises: transmitting, to the second computer system, a first portion of the requested data at a first effective rate; and determining to delay a transmission of a second, subsequent portion of the requested data to the second computer system in order to cause the second portion to be transmitted to the second computer system at a second effective rate that is slower than the first effective rate.

---

this motion is ruled upon, and which is incorporated by reference as if fully set forth herein.
[3] For example, AT&T's motion did not meaningfully address system claim 16, which has more structure than method claim 1, and which would be more concrete and less abstract even under AT&T's flawed reasoning.

As of the priority date of the '994 Patent, publicly accessible servers were often used inappropriately in violation of agreed terms of service for the distribution of media files such as large software, music, and video files. '994/1:28-32; AmendCompl, ¶ 16. Such media files tended to be, and still often are, much larger than the files that the host service is intended for. '994/1:32-34; AmendComp, ¶ 16. Consequently, the storage and exchange of these inappropriate files demands greater bandwidth than more appropriate uses, thereby choking and discouraging the uses that the web server is intended to serve. AmendComp, ¶ 17; '994/1:35-40. Additionally, these types of media files often contain illegally copied content that may lend an undesirable taint to operators of web hosting services who do not wish to be perceived as encouraging copyright violations. *Id*. Another injury caused by such inappropriate use was, and still is, disproportionately heavy use of the server by relatively few users, thereby reducing the number of subscribers that the hosting service attracts. '994/1:41-44; AmendComp, ¶ 17.

In order to address these problems, and others, a method and system, such as that of the '994 patent, was needed to discourage inappropriate use of publicly available, network-connected server space, without adversely affecting intended uses of the server space or restricting public access, wherein the method and system integrate seamlessly and cost-effectively with existing network protocols and server software and hardware. '994/1:48-52; AmendComp, ¶ 19. The recited technology comprises the transfer rate of requested files being controlled and varied during transfer of the file. '994/1:61-64; AmendComp, ¶ 19. The method is particularly suitable for application to every file transferred from the server. *Id*.

The delaying action of the system serves to preserve system bandwidth for transfer of smaller files, and further discourages users from requesting the transfer of large files, thereby preserving system bandwidth to an even greater degree. '994/2:5-8; AmendComp, ¶ 20. The response of the server to appropriate uses can be greatly improved at the same time system performance is

deliberately degraded for inappropriate uses. '994/2:8-14; AmendComp, ¶ 20. Furthermore, the method is easy to implement in a variety of different systems with minimal additional overhead. *Id*.

The server may be connected through a network to a plurality of client devices AmendComp, ¶ 21; '994/2:14-18. The delay period may be initiated, and the amount of increase or other adjustment to the delay period during the transfer cycle may be controlled, by selected a predetermined value from a table, or by calculating a value based on variable input parameters such as the file size, server load, network response time, and number of transfer requests from the client device within a defined prior period. '994/2:29-38; AmendComp, ¶ 21. The packet size-may have a value that is similarly initiated and adjusted during the transfer cycle. *Id*.

**B.** **The relevant prosecution history.**

During prosecution of one of the predecessor continuation applications to the '994 patent, the '319 application, the Patent Examiner issued office actions on August 2, 2004; May 3, 2005; June 5, 2006; and May 11, 2007 stating that the claims under examination were obvious under 35 U.S.C. ¶ 103 in light of U.S. Patent No. 5,850,900 to Kalkunte ("Kalkunte"). Exh. 3 (see quotes below) & Exh. 4 (Kalkunte"). After the Applicant filed an appeal brief, the Patent Examiner finally allowed the claims of U.S. Patent No. US 7,370,110, which issued from the '319 application. In his appeal brief, the Applicant correctly described the invention disclosed in Kalkunte, including as follows:

> Kalkunte is concerned with entirely different objectives of increasing network throughput and preventing traffic collisions. Col. 2:62-6; col. 3:1-13. At most, Kalkunte discloses that under some circumstances (for example, if a collision is detected) a packet may be delayed so as to avoid network collisions. *See, e.g.*, col. 5:54-57. Under other circumstances during transmission of the same file, Kalkunte teaches reducing the delay interval to zero to accomplish a faster overall transmission. Col. 3:35-46; 6:45-55….
>
> Kalkunte teaches how to *increase* network throughput, which necessarily requires *decreasing* transmission times and conversely *increasing* transmission rates. Col. 2:62-64; 8:21-29; Tables 1-3…
>
> For its first embodiment, Kalkunte teaches "waiting a delay time that includes a predetermined interpacket gap interval and one slot time if the detecting step detects the second data packet." Col. 3:19-22. The second data packet refers to a second packet waiting to be transmitted. Col. 3:17-19. "Slot time" is used in Kalkunte consistent with

its meaning in the art of Ethernet transmissions, to denote the amount of time a device waits after a collision before retransmitting. The rationale and effect of this method is described in Kalkunte at col. 6:17-29 as a way to avoid collisions on 2-station and 3-station Ethernet networks. The duration of the slot time is according to convention…

For its second embodiment, Kalkunte teaches calculating, when a network collision occurs, a "collision delay interval ... as an integer multiple of a predetermined slot time randomly selected from a range of intervals *calculated from an exponential number of the access attempts."* Col. 3:46-50, emphasis added. So if a collision occurs, the delay interval is based on network conditions… If no collision occurs, the delay interval is set to zero. Col. 3:30-45…

Kalkunte there discloses passing information byte-by-byte from a PCI bus interface to a transmit FIFO register of an Ethernet controller… among other things, a "byte" is not a "packet" as these claims define. The present specification describes a packet as "preferably the same or larger than the size of the typical packet size of the transmission control protocol in use on the network over which the file will be transferred, such as, for example, 8192 (8k) bytes." Page 5:27-29. A single byte is one of the lowest-level group of information bits used in computing, and it is not reasonable to construe a "byte" as a "packet" similar in size to a packet in a packet-switched network…

A PCI bus would be understood as servicing an internal bus, not a packet-switched network… If the PCI bus interface is ignored, in effect Kalkunte discloses a transfer of data from a CPU to a FIFO register of an Ethernet controller…

Kalkunte's stated purpose of increasing network throughput. Col. 2:62-64. Given a constant bandwidth and transfer medium, throughput can only be increased by increasing transmission rate. Kalkunte teaches increasing delays only to prevent collisions and the longer delays that collisions would cause. Col. 3:23-30…

In every instance disclosed in Kalkunte, the delay interval is determined based on network conditions. Col. 5:23 - 7:49; figs. 3A-3C….

In summary, Kalkunte is concerned only with whether or not a collision has occurred in determining a delay period. Col. 5:23 - 7:49; Figs. 3A-3C…

Exh. 3, pp. 13-23. Thus, the alleged "throttling" of Kalkunte involved substantially different techniques to address substantially different problems and achieve substantially different results.

As noted above, the '994 patent is a direct descendent via a line of continuation applications (each of which issued as a U.S. Patent) from the '319 application. The application for the '994 patent was filed on April 26, 2012 as U.S. Patent Application No. 13/457279 (the "'279 application"). During prosecution of the '279 application, on March 5, 2013, the Patent Examiner rejected the then pending claims as being anticipated by U.S. Patent No. 5,832,232 to Danneels ("Danneels") (Exh. 5). "Without conceding the propriety of the rejections," the Applicant amended claim 21 (which ultimately issued

as claim 1), to add the following underlined language:

> in response to said determining, the first computer system throttling transfer of the data to the second computer system, wherein the throttling is based at least in part on the determined quantity of other data previously transferred to the second computer system and comprises: transmitting a first portion of the requested data at a first effective rate; and determining to delay transmission of a second, subsequent portion of the requested data in order to cause the second portion to be transmitted at a second effective rate that is slower than the first effective rate.

The same language was added to independent system clam 28 (now issued claim 8), and similar language was added claim 36 (now issued claim 16).

In arguing for allowance of the amended (now issued) claims over Danneels, the Applicant correctly pointed out many of the substantial differences between the claimed invention and Danneels, including the following:

> Danneels relates to "user-based flow control in a network system." See Danneels Abstract. More particularly, Danneels states that a "flow control process 220 receives data requested by a client system ... and separates the requested data into two or more portions." Danneels at col. 4, lines 16-20. The separated data "portions are then forwarded to connection management logic 210 with a time delay between each portion." Id. at col. 4, lines 21-22. Danneels thus teaches that "a first portion of the requested data is sent to the client system and, after [a] period of time has elapsed, a second portion of the requested data is sent." Id. at col. 1, lines 54-57.
>
> Notably, the "time delay" used between two different data portions in Danneels is "determine[d] ... based on an expected user processing time." See Danneels at col. 4, lines 22-24. (emphasis added). For example, Danneels notes that "an individual user of a client system often times does not need the entirety of the data requested." Id. at col. 1, lines 28-30. Danneels thus seeks "to provide a way to control the flow of data ... so that transmission of unnecessary data to the client system is reduced." See id. at col. 1, lines 40-43. Accordingly, Danneels' "flow control process makes the determination based on how quickly the flow control process expects the user ... to process (for example, view) the requested data." See id. at col. 5, lines 24-27 (emphasis added).
>
> Applicant respectfully submits, however, that Danneels does not teach or suggest "throttling … to cause the second portion to be transmitted at a second effective rate that is slower than the first effective rate" as recited by amended claim 21. For example, there is nothing in Danneels that teaches or suggests that a "determin[ation] to delay transmission" is made "in order to cause [a] second portion to be transmitted at a second effective rate …" … Instead, Danneels merely teaches that a "determination of the period of time between sending portions of data [may] vary" in Danneels, see id. at col. 6, lines 48-49…

Exh. 6, pp. 58-59 ('994 file history). Thus, the alleged "throttling" of Danneels involved substantially different techniques to address substantially different problems and achieve substantially different results.

In its Motion, AT&T admits that, "the prosecution history of the patents in the family—including the '994 patent—are replete with amendments made to avoid prior art in the computer and networking fields." Mtn. at p. 6. This illustrates that AT&T is incorrect when it alleges that the '994 patent is just applying a generic computer to prior art processes, and that AT&T is also incorrect when it alleges that the claimed subject matter was conventional, well known, oft applied, etc. As can be seen, the approach was unconventional, including as distinguished from prior art techniques.

## III.   ARGUMENT.

### A.   Section 101 Case Law.

While this Court is well-aware of the somewhat evolving nature of the § 101 analysis, it is noted that recent opinions have expanded on, and clarified, the requirements of § 101. Primary among those is the recent *McRO* decision, which reversed the district court's finding of ineligibility for claims that "aim to automate a 3-D animator's tasks, specifically, determining when to set keyframes and setting those keyframes." *McRO v. Bandai*, 837 F.3d 1299, 1307 (Fed. Cir. 2016). In so holding, the Federal Circuit held, among other things, that 1) processes that automate tasks that humans are capable of performing are patent eligible if properly claimed. *Id*. at 1313; 2) AT&T has the burden of proving, using "record evidence," not just "attorney's argument" *Id.* at 1315 3) the abstract idea exception should only be applied to prevent patenting of claims that abstractly cover results where it matters not by what process or machinery the result is accomplished, and the inquiry is whether the claims at issue "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea…." *Id*. at 1314. *see also Perdiemco v. Industrak*, 2:15-cv-727-JRG-RSP, p.12 (E.D. Tx. Sept. 21, 1016), report and recommendation

adopted, 2016 WL 5475707 (E.D. Tex. Sept. 29, 2016) (holding claims that recited a specialized procedure for accomplishing a result to be patent eligible); 4) claims directed to rules embodied in software processed by general purpose computers are patent eligible, such as claims that use limited rules in a process specifically designed to achieve an improved technological result in conventional industry practice. *McRO* at 1312; *See* also *Perdiemco* at p. 11 ("the mere fact that all the recited computer components are "conventional" because the applicant did not invent an entirely new kind of computer is not inherently troubling."); 5) the automatic use of rules of a particular type was a specific asserted improvement in the relevant technology and thus patentable. *McRO* at 1314; 6) as part of step one, the movants had the burden of providing evidence that prior manual processes were the same as the process required by the claims. *Id.*; 7) "The concern underlying the exceptions to § 101 is not tangibility, but preemption." *Id.* at 1315; 8) courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims, and, as in *Enfish*, the Court reiterated that the § 101 analysis must not be divorced from the specific language of the claims. *Id.* at 1313; and 9) at step one and step two of the *Alice* test a court must look to the claims as an ordered combination, without ignoring the individual steps. *Id.* Further, in the recent *Tridia* case, the court held a patent on remote access software as comprising an improvement in an existing technological process and thus patent eligible. *Tridia vs. Sauce Labs*, 1-15-cv-02284 (N.D. Ga. Sept. 28, 2016). In so holding, the court noted that where a patent describes a solution which "overcomes a flaw in existing technology" and "which solves the prior art problems" noted in the patent, the court could not "say as a matter of law at this stage that the patent does not describe an inventive concept." *Id.* at pp. 20-21.

**B.      The claimed '994 invention is not directed to an abstract idea.**

Step 1 of the eligibility analysis asks what the claims are "directed to." *See Alice Pty. v. CLS Bank*, 134 S. Ct. 2347, 2354-55 (2014). Patent claims satisfy § 101's requirements if, as here, they "improve

the functioning of the computer itself," or "effect an improvement in any other technology or technical field." *Id.* at 2359. When deciding issues of § 101 in a motion for judgment on the pleadings, "the Court must take the specification's statements about the purported invention to be true." *MAZ Encryption v. Blackberry* 2016 WL 5661981, *5 (D. Del., Sept. 29, 2016). The Court should not give weight to AT&T's mere attorney argument to the contrary. *Id.*

Improvements in computer-related technology, such as the instant claims, and claims directed to software are not inherently abstract. *Enfish v. Microsoft*, 822 F.3d 1327, 1337 (Fed. Cir. May 12, 2016). Further, even if AT&T was correct in arguing a pre-internet analog, which it is not, "the existence of a pre-Internet analog does not end the inquiry, so long as the 'focus of the claims is on [a] specific asserted improvement in computer capabilities' rather than a process 'for which computers are invoked merely as a tool.'" *Device Enhancement v. Amazon*, 2016 WL 2899246, *10 (D. Del. May 17, 2016). Specifically, when software-implemented claims are directed, as these claims are, to an improvement to computer functionality, they are not abstract. *Enfish*, 822 F.3d at 1335-36.

Here, there is nothing abstract about the claims, including when properly viewed as a whole, as there are tangible, inventive, meaningful, unconventional, novel, non-routine, and non-customary elements over prior art, at the time of the invention, including as noted above, comprising such tangible items as a non-abstract first computer system, a non-abstract processor, a non-abstract storage device having non-abstract executable instructors stored thereon, a non-abstract second computer system, a non-abstract request to transfer non-abstract data to the second computer system; a non-abstract quantity of other non-abstract data previously transferred to the second computer system; a non-abstract throttled transfer of the data to the second computer system, a non-abstract transmission of requested data, a non-abstract first portion of the requested data being transferred at a non-abstract first effective rate; a non-abstract delay of a transmission of a non-abstract second portion of requested data to the second computer system in order to cause the second portion to be at

a non-abstract second effective rate slower than the first effective rate; non-abstract networks, or non-abstract network addresses. AmendComp, ¶ 23. None of these, or the other non-abstract claim limitations, alone, or certainly taken as a whole, are abstract. The combinations of the claim elements are far more specific and are far afield from AT&Ts' overbroad and oversimplified characterizations.

The "directed to" inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether "their character as a whole is directed to excluded subject matter." *Enfish*, 822 F.3d at 1335-36. At a minimum, all claims of the '994 patent, including the independent claims, are directed to, *inter alia*, network access and bandwidth management and allocation, wherein a server or other computer hardware is configured to transfer information to a plurality of client devices in accordance with bandwidth-limiting and bandwidth-adjustment techniques, including reducing bandwidth based on an amount of data previously transferred to a client device, based on variable input parameters such as file size, data type, server load, network response time, and number of transfer requests from a client device within a prior period of time, by inserting delays between portions of data being transmitted determined based on the various factors above, or adjusted dynamically. Amend Complaint, ¶ 24. *See* Claims 1, 8, & 16. Their character, as a whole, is not directed to an abstract idea. *Enfish,* 822 F.3d at 1335. These things exist only in the context of computers, and specifically computer networks. *Id.* Further the rules defined by the claims, including rules of throttling based at least in part on the determined quantity of other data previously transferred and the rules requiring a first and slower second effective rate, also distinguish from the abstract.

As noted in the '994 patent, the technologies therein achieve numerous benefits comprising:

a. Reducing or eliminating the choking and discouragement of uses that the web server is intended to serve because the greater bandwidth demands required for the storage and exchange of inappropriate files compared to more appropriate uses. '994/1:35-37.

b. Reducing or eliminating the amount of media files containing illegally copied content that may lend an undesirable taint to operators of web hosting services who do not wish to be perceived as encouraging copyright violations. '994/1:37-40.

c. Reducing or eliminating disproportionately heavy use of the server by relatively few users which may reduce the number of subscribers... '994/1:41-44.

d.   Reducing or eliminating the devaluation of advertising space as a result of people downloading such files, and the potential for alienating advertisers who have purchased advertising space on the servers serving such files. '994/1:44-47.

e.   Preserving system bandwidth for transfer of smaller files, and further discouraging users from requesting the transfer of large files, thereby preserving system bandwidth to an even greater degree. '994/2:5-8.

f.   Greatly improving the response of the server to appropriate uses while at the same time deliberately degrading system performance for inappropriate uses. '994/2:8-11.

g.   Increasing the defined delay period after each execution of a packet transfer cycle (or after a selected number of cycles), thereby discouraging the transfer of unacceptably large files, wherein the delay period may be initiated, and the amount of increase or other adjustment to the delay period during the transfer cycle may be controlled, by selected a predetermined value from a table, or by calculating a value based on variable input parameters such as the file size, server load, network response time, and number of transfer requests from the client device within a defined prior period. '994/2:26-36.

*See* AmendComp, ¶ 22. The inventive concept of the '994 patent, including as demonstrated by the substantial differences between the claimed invention and the prior art, including as noted above, and as demonstrated by the many benefits of the invention, including as noted above, greatly enhances and facilitates technological networked methods, computer-readable media, and systems which comprise the claimed steps, computer readable media, and apparatuses. AmendComp, ¶ 23. This inventive concept and "substantially more" comprises a first computer, *e.g.*, a server, throttling data being sent to a second computer, *e.g.*, a client device, based at least in part on the determined quantity of other data previously transferred to the second computer, which comprises transmitting, to the second computer system, a first portion of the requested data at a first effective rate; and determining to delay a transmission of a second, subsequent portion of the requested data to the second computer system in order to cause the second portion to be transmitted to the second computer system at a second effective rate that is slower than the first effective rate. Here, a computer is configured to transfer information to a plurality of client devices in accordance with bandwidth-limiting and bandwidth-adjustment techniques, including reducing bandwidth based on an amount of data previously transferred to a client device, based on variable input parameters such as file size, data type, server load, network response time, and number of transfer requests from a client device within

a prior period of time, by inserting delays between portions of data being transmitted determined based on the various factors above, or adjusted dynamically. AmendComp, ¶ 24.

Dependent claims 2-7, 9-15, and 17-18 also contains additional unconventional, non-routine, novel, meaningful, and inventive claim limitations, including when each claim is viewed as a whole, which comprise the request to transfer data specifying a particular data file, determining a length of a delay period based on a type of the data, the throttling temporarily halting a transmission for at least the length of the delay period, the data packets being used to transfer the data determining the quantity of other data previously transferred to the second computer system based on data transferred during a defined prior period of time, the request to transfer data being a request for a file hosted by a server running on the first computer system, determining the quantity of other data previously transmitted to the second computer system is based on network identification information associated with the second computer. AmendComp, ¶¶ 34-37, 42-44, & 50-51.

The Federal Circuit held in *DDR* that patent claims satisfied § 101 where, as here, "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). The Federal Circuit also clarified that a relevant inquiry at step one is 'to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" *In re TLI Commc'ns.*, 2016 WL 2865693, *3 (Fed. Cir. May 17, 2016). The Court "contrasted claims 'directed to an improvement in the functioning of a computer' with claims 'simply adding conventional computer components to well-known business practices,' or claims reciting 'use of an abstract mathematical formula on any general-purpose computer,' or 'a purely conventional computer implementation of a mathematical formula,' or 'generalized steps to be performed on a computer using conventional computer activity.'" *Id.* As noted above, the technology of the '994 patent improves the functioning of networked computers and networks, it improves networked

computer and network capabilities, and it improves over then existing technological networking processes, including with respect to network access and bandwidth management and allocation.

Further, the '994 Patent claims cannot be practiced by a human alone, and there exists no human analogue to the methods, computer-readable media, or systems claimed in the '994 Patent. AmendComp, ¶ 29. The only alleged analog stated by AT&T is "when a construction manager manages a supply chain by delaying a second delivery of construction materials from a construction yard to a job site based on previous deliveries to that same site." Motion at 1. However, this pre-internet practice is not analogous. Unlike AT&T's contorted example of a construction yard, with presumably limited supplies of materials, in the data networks of the '994 patent, the supply of data is not constrained in the same manner. What is constrained is the bandwidth for transmitting that data. Further, the claimed methods, computer readable media, and systems pertain to networks in which data flows to multiple unrelated computers. All of the data is delivered as requested, but due to limited bandwidth, the heavy users tend to slow speeds for other users. In AT&T's non-analogous example, the job site has apparently received enough materials to suit its present needs so the construction manager can delay more shipments – *i.e.*, the total amount shipped is limited, not the amount shipped at a given time. In contrast, with the '994 claimed invention, specific data intended for a second computer is not throttled because the recipient has received enough data to suit its present or prior needs. The throttling occurs because the recipient has received excessive amounts of data (*e.g.*, amounts meeting a set threshold), and he or she is requesting more data, which, given the limited bandwidth of the transmission network, tends to reduce network speed for other users. Unlike AT&T's example, due to the zero sum game inherent with competing users of limited bandwidth, the requesting party is throttled to its detriment and to benefit the other users of the system due. When throttling occurs the benefit to the other users should be immediate because congestion is reduced. Due to the substantial differences between the claimed subject matter and Defendants' non-analogous

construction manager example, even if a computer were substituted for the human construction manager, and/or if data was substituted for construction materials, the systems would still employ substantially different methods for substantially different purposes.

The alleged abstract idea stated by AT&T is only slightly more applicable to the claimed inventions, but still, at most, merely analogous to the prior art Danneels system, wherein the time delay between two different data portions determined based on an expected user processing time, *i.e.*, the user doesn't need the second data that fast. However, as noted above, the '994 claims were allowed over Danneels, in part because they are novel over Danneels.

The '994 claims and specification are relatively succinct, but they are not at a high level of generality. The claims, including in the context of the specification, are specifically directed to, *inter alia*, network access and bandwidth management and allocation, wherein a server, or other computer hardware, is configured to transfer information to a plurality of client devices in accordance with bandwidth-limiting and bandwidth-adjustment techniques, including reducing bandwidth based on an amount of data previously transferred to a client device, based on variable input parameters such as file size, data type, server load, network response time, and number of transfer requests from a client device within a prior period of time, by inserting delays between portions of data being transmitted determined based on the various factors above, or adjusted dynamically. AmendComp, ¶ 29. These things exist only in the context of computers, and specifically computer networks. *Id.*

The claims cover, *inter alia*, specific applications of specific methods, computer-readable media, and computer systems for transferring information to a plurality of client devices in accordance with bandwidth-limiting and bandwidth-adjustment techniques, including reducing bandwidth based on an amount of data previously transferred to a client device, based on variable input parameters such as file size, data type, server load, network response time, and number of transfer requests from a client device within a prior period of time, by inserting delays between portions of data being transmitted

determined based on the various factors above, or adjusted dynamically, including in order to achieve the aims of the invention as stated above, and to overcome the shortcomings in the prior art, including prior art network access and bandwidth management and allocation methods, computer-readable media, and systems, as noted above. AmendComp, ¶¶ 30, 38, & 46. The claims comprise, *inter alia*, specific applications or improvements to technologies in the marketplace, including the improvements to the existing network access and bandwidth management and allocation methods noted above. *Id.* The claimed technology constitutes the application of certain ideas, and necessitates the use of discrete computer hardware and software components configured and programmed in a particular way that enable performance of the specified networking functions. *Id.*

AT&T does not, and cannot, claim that packet switched networks and hardware, including servers, were not around for years prior to the '994 priority date. Thus, it cannot be said that the '994 patent merely applies a conventional computer to the prior art. What does not predate the '994 patent are the novel network management and allocation techniques implemented by specially programmed computers and related networking equipment, that the '994 inventor was the first to invent.

AT&T claims that "throttling" existed in the prior art, but the prior art of record demonstrates that purposes for, implementations of, and results of any alleged prior art alleged "throttling" were substantially different from the claimed invention. The claimed invention uses computer technology to overcome the shortcomings of prior art of prior computer and networking technology, as noted above, including state of the art network access and bandwidth management and allocation methods, computer-readable media, and systems, which lacked, *inter alia*, the ability to perform the claimed steps. AmendComp, ¶¶ 32, 40, & 48. As such, the claims overcome a technical problem and effect an improvement to a specific technology or technical field, namely computer networks and networking. *Id.* Including as evidenced by the novelty and distinctiveness of the claims over the prior art, including Kalkunte and Danneels, the claims recite an invention that was not merely a routine or conventional

use of the Internet. *Id*. One such inventive component is improving network access and bandwidth management and allocation in ways necessarily rooted in computer technology to overcome problems specifically arising in the realm of computer networks, including the Internet. AmendComp, ¶ 25.

Including as evidenced by the claims, specification, and prosecution history, the claimed invention was not practiced by others prior to the '994 invention, nor was it a well-known,[4] often applied, fundamental economic or conventional business practice, nor was it a practice to which general-purpose computer components were added after the fact. The claimed invention is not directed to a longstanding commercial practice, nor does it merely apply generic or general purpose computers to prior art methods, computer-readable media, or systems. AmendComp, ¶¶ 33, 41, & 59. As noted above, even if a computer was added, AT&T's alleged prior art analogy would still be substantially different from the claimed invention. The same applies to other alleged prior art, as exemplified by the above-noted prior art of record. Including as noted above, prior art methods, computer-readable media, and systems were incapable of the functionality of the claim 1 method. *Id.*

When properly viewed, the claims of the '994 patent do not embody an abstract concept, or a concept similar to those found by other courts to be abstract, nor fall into any of the categories identified in *DDR* or AT&T's Motion. The claims comprise specific, non-abstract physical components and interactions between those components which collectively meet the claim limitations. Because the subject claims are not, including as a whole, directed to an abstract idea, AT&T has not met its high burden at the pleadings stage of overcoming the presumption of validity and proving by clear and convincing evidence that the any claims of the '994 patent are directed to a patent ineligible abstract idea. At most, AT&T has shown only that the claims ***involve*** an abstract

---

[4] Even if allegations of something being "well-known in the prior art" are true – which in this case they are not, including because the throttling techniques of the '994 patent were not known at all - "section 101 eligibility should not become a substitute for a patentability analysis related to prior art, adequate disclosure, or the other conditions and requirements of Title 35." *Research Corp. Tech., Inc. v. Microsoft Corp*., 627 F.3d 859, 868 (Fed. Cir. 2010); *Evolved Wireless, LLC v. Apple Inc*., 2016 WL 6440137, *7 (D. Del. Oct. 31, 2016).

idea – insufficient at step one. *See Yodlee*, 2016 WL 2982503 at *19.

AT&T's attempt to distinguish the *Core Wireless* case are unpersuasive. *See Core Wireless Licensing, S.A.R.L., v. LG Electronics Inc., et al*., Case No. 2:14-cv-911 (August 8, 2016), ECF No. 532. Contrary to AT&T's attorney argument, the cited reasons in AT&T's Motion include reasons this case is analogous. In *Core Wireless*, the patent taught that transmission rates can "be 'slowed down' or 'decelerated' by sending the data 'to the physical layer every n*TTI, instead of once every transmission time interval (TTI).'" *Id*. at *4. Here, as in *Core Wireless*, the '994 patent is "directed to an improvement on an existing type of 'traffic metering' in [a] wireless network" (*id*. at *9), including that the '994 patent permits a transmission rate to be slowed down, including by inserting delays between portions of data being transmitted determined based on the various factors above, or adjusted dynamically. Amend Complaint, ¶ 24. *See* Claims 1, 8, & 16. As noted in *Core Wireless*, the Court is "not faced with a situation where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation." *Core Wireless*, No. 2:14-cv-911 (citing *Enfish*, 822 F.3d at 1339). The '994 patent is directed to a specific type of packet traffic-metering that is confined to, and solves problems arising in, client-server computer networks. *Id*; *See McRO*, 837 F.3d at 1315 ("a combined order of specific rules that renders information into a specific format"); *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) ("the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user").

Unlike the non-analogous cases cited by AT&T, the Asserted Claims "effect an improvement in [the network management technology]…field" and improve the functioning of computers. *Alice*, 134 S.Ct. at 2359. In addition to being rooted in computer technology similarly to *DDR* noted above, the claims here "are directed to a specific improvement to the way computers operate, embodied in the" specific location network management techniques claimed in the patent. *Enfish*, 822 F.3d at 1335-36.

Granting AT&T's Motion requires *clear and convincing evidence* of unpatentability. However, any reasonable comparison of the claims and AT&T's overbroad attempt at claim distillation illustrates that AT&T glosses over these limitations, including failing to consider the claims as a whole.

Further, multiple other cases held similar patents related to network management and bandwidth allocation technologies to be patent eligible. In *Signal IP Inc. v. American Honda Motor Co*., LA CV14–02454 JAK (C.D. Cal, Mar. 22, 2016), the plaintiff asserted U.S. Patent No. 5,954,775 relating to a method of accommodating communication of two types of data at different data rates on a common communication link. That court held the claims to be patent eligible, in part because they did not did not fit into any of the categories of abstract ideas but instead described a particular communications protocol. In *Genband US LLC v. Metaswitch Networks Corp*., Case No. 2:14-cv-33-JRG-RSP, Dkt. No. 408 at 17 (E.D. Tex. Jan. 6, 2016), the court denied a motion for summary judgment based upon the subject matter eligibility of the '561 patent, which related to a method of protecting a computer network while transmitting and receiving IP packets. The court found the claims to be patent eligible, noting that the patent, *inter alia*, attempted to overcome a problem specifically arising in the realm of computer networks and improved the functioning of the computer itself. In *SimpleAir v. Google, Inc.*, (N.D. Tex. Sept. 25, 2015), the court denied a motion for summary judgment of invalidity against certain claims relating to systems and methods for transmitting data to remote computing devices. The court found that the patents were patent-eligible because they were "directed toward an abstract idea, because they are directed toward patent-eligible methods and systems of 'using a central broadcast server' to package and transmit 'data from an online information source to remote computing devices.'" In *Intellectual Ventures I, LLC v Motorola Mobility*, 201581 F.Supp.3d 356 LLC (D. Del. 2015), the court found patent eligible methods of allocating wireless bandwidth and system resources based on contents of the packets to be communicated.

AT&Ts' characterization of the alleged abstract idea of the '994 patent misses the mark in

multiple respects. "[I]t is fundamentally improper to paraphrase a claim in overly simplistic generalities in assessing whether the claim falls under the limited 'abstract ideas' exception…Patent eligibility must be evaluated based on what the claims recite" (*CyberFone v. Cellco*, 885 F. Supp. 2d 710, 716 (D. Del. 2012)), not merely AT&T's attorney argument (*MAZ*, 2016 WL 5661981 at *5).

**C.**      **Assuming arguendo that it would be proper to distill an abstract idea from the claims, AT&T's erroneous and oversimplified allegation of the abstract ideas ignores meaningful limitations and fails to consider each claim as a whole.**

AT&T's oversimplified and overgeneralized mischaracterization of the claimed inventions erroneously omits the material, meaningful, and inventive claim limitations noted herein, and thus violates the guidance of *Alice, Mayo,* and *Diehr*. The second step requires the court to determine if the elements of the claim individually, or as an ordered combination, "transform the nature of the claim" into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. "[T]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification," and asks whether there is [a] inventive concept that transforms the abstract idea into a patent-eligible invention [which] must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer." *Bascom*, 827 F.3d at 1349. While *Enfish* found validity at step one, "some inventions' basic thrust might more easily be understood as directed to an abstract idea, but under step two of the *Alice* analysis, it might become clear that the specific improvements in the recited computer technology go beyond well-understood conventional and render the invention patent-eligible, which is what *DDR* held. *Id*.

The appropriate analysis of whether a claim satisfies § 101 requires viewing the claim as a whole, *Diehr*, 450 U.S. 175, and not individual limitations. *King Pharms. v. Eon Labs*, 616 F.3d 1267, 1277 (Fed. Cir. 2010). This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were known or used before the combination. *Diehr*, 450 U.S. at 188. "[A]n inventive concept can be found in the non-

conventional and non-generic arrangement of known, conventional pieces." *Bascom*, 827 F.3d at 1350. Where the claims "purposefully arrange the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks," they are patentable. *Amdocs v. Openet Telecom*, 841 F.3d 1288, 1301 (Fed. Cir. 2016).

As noted in PrefNet's' Amended Complaint, and as is evident from the patent itself, the technology recited in the claims provides an inventive concept. As can be seen, when the claims are properly considered as a whole, there is nothing (especially given the high burden at the pleadings stage) abstract, routine, well-understood, conventional, generic, existing, commonly used, well known, previously known, and/or typical about them. Rather, contrary to AT&T's assertion that "[t]he '994 patent merely takes the abstract idea of delaying delivery (also known as 'throttling') and applies it to a generic 'computer system' 'transferring data,'" the claims of the Patents-in-Suit contain "meaningful limitations" or an "'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355. AT&T has no evidence that the claimed inventions could have been implemented wholly with generic or conventional components because that is merely a fiction supported by nothing more than unsworn, uninformed arguments. Instead, the claims recite particular network access and bandwidth management and allocation methods, computer-readable media, and systems that overcame the limitations of prior art network access and bandwidth management and allocation systems and methods by providing methods, computer-readable media, and systems. The claims do not simply recite an abstract idea and say "apply it."

Including when viewed as a whole, including in light of the specification, at the time of the invention, there are sufficient unconventional, non-routine, novel, meaningful, and inventive claim limitations to the claims that are sufficient to ensure that the claim in practice amounts to significantly more than merely a patent on any abstract idea or patent ineligible concept. AmendComp, ¶ 31, 39 &

47. Those unconventional, non-routine, novel, meaningful, and inventive claim limitations comprise the set of ordered steps as noted above. *Id.* For example, including when the claims are viewed as a whole, there are sufficient unconventional, non-routine, novel, meaningful, and inventive claim limitations that are sufficient to ensure that the claim in practice amounts to significantly more than merely a patent on any abstract idea or patent ineligible concept. AmendComp, ¶ 47. Those unconventional, non-routine, novel, meaningful, and inventive claim limitations comprise the following: computer-readable memory having instructions stored thereon that are executable by a first computer system to cause the first computer system to perform operations comprising receiving, at the first computer system, information indicating a request to transfer data to a second computer system; determining a quantity of other data previously transferred to the second computer system; and in response to said determining, causing transfer of the data to the second computer system to be throttled, wherein the throttling is based at least in part on the determined quantity of other data previously transferred to the second computer system and comprises transmitting a first portion of the requested data to the second computer system at a first effective rate; and determining to delay transmission of a second, subsequent portion of the requested data to the second. *Id.*

Further, as noted above, the claimed '994 invention overcame deficiencies in the prior art. This is done with a novel combination of the claim elements recited above. These novel combinations are significantly more than the alleged abstract ideas erroneously stated by AT&T. The claimed '994 invention overcomes shortcomings and/or deficiencies in the prior art, including greatly enhancing and facilitating technological networked methods, computer-readable media, and systems which comprise the claimed steps, computer readable media, and apparatuses, including by providing the benefits noted above. AmendComp, ¶ 23. Special hardware and software is required to implement the claimed invention, including a specialized computer of for transferring information to a plurality of client devices in accordance with bandwidth-limiting and bandwidth-adjustment techniques,

including reducing bandwidth based on an amount of data previously transferred to a client device, based on variable input parameters such as file size, data type, server load, network response time, and number of transfer requests from a client device within a prior period of time, by inserting delays between portions of data being transmitted determined based on the various factors above, or adjusted dynamically, including in order to achieve the aims of the invention as stated above, and to overcome the shortcomings in the prior art, including prior art network access and bandwidth management and allocation methods, computer-readable media, and systems, as noted above. *Id.* at ¶¶ 38 & 46.

Similar to *DDR Holdings*, the Asserted Claims are "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). These inventions are necessarily rooted in computer, including network management and bandwidth allocation technology, including because the claims of the '994 patent comprise specific hardware and software configured to transfer information to a plurality of client devices in accordance with bandwidth-limiting and bandwidth-adjustment techniques, including as noted above. Such specific hardware and software overcome problems specifically arising in the realm of computer networks and are necessarily rooted in computer technology.

As such, the subject claims overcome a technical problem per *DDR Holdings* and they also "effect an improvement in any other technology or technical field." *See Alice*, 134 S.Ct. at 2359. Further, the claim elements of the '994 patent are precisely the type of "inventive concept" that can render an otherwise "abstract idea" patentable. *See DDR*, 773 F.3d at 1258 (noting that claims that do not "recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations, such as the claims in *Alice, Ultramercial, buySAFE, Accenture,* and *Bancorp* . . . [are] patent-eligible under

§ 101").

AT&T is mistaken in its conclusion that the specifically claimed technology is or was wholly "conventional." "Conventional" means "generally accepted" or "prevalent." AT&T has provided no evidence showing that the recited technology, when a combined as a whole, was known or used prior to the invention date, including as noted above. Among other things, AT&T fails to explain how the inventions' specific limitations which overcome the prior art of record, including Kalkunte and Danneels, to provide the above noted benefits, was "generally accepted" or "prevalent" at the time.

AT&T's attempt to pick apart the claims element by element as involving allegedly known, conventional, generic, routine, etc. features also makes the fatal flaw of failing to consider the claims as a whole. It is easy to see the claims through the lens of current technology,[5] but it is important to recognize that, at the time of the invention, there was no precedent for the claimed network management and bandwidth allocation methods, computer-readable media, and systems, including as noted above. The '994 claims lay out an architecture that achieves the specific benefits noted above, including specific hardware components, specific software components, the devices on which those components reside, and how they communicate. When properly considered as a whole, the claims have meaningful, significant technological features, including with respect to the combinations of elements of the '994 patent. As noted herein, the inventions of the '994 patent "[are] tied to a specific structure of various components." *Amdocs*, 841 F.3d at 1301. Further, where claims involve generic components that "operate in an unconventional manner to achieve an improvement in computer functionality," they are patentable. *Id*. at 1300. Without limitation, the claims comprise an architecture for improving network management and bandwidth allocation methods, computer-readable media,

---

[5] Such an analysis is what the court in *Tridia* cautioned against, including that, at the pleadings stage, a finding against plain statements in the patent may "convert [a motion to dismiss on the pleadings] into a novelty or obviousness analysis under §§ 102 and 103, as the Federal Circuit cautioned against in BASCOM," and the pleadings stage "is not the correct procedural posture" for such analysis. *Tridia*, 1-15-cv-02284, at 21, fn. 5. AT&Ts' arguments in the present case create a similar risk of converting the analysis to one of novelty or obviousness.

and systems, including as noted above.

Further, to the extent that AT&T's over-simplification of the claimed invention constitutes a difference in views on claim scope or the meaning of claim terms, then AT&T's motion is simply premature and unsupported where there are factual disputes to be resolved, including regarding whether the claims have meaningful limitations and/or inventive concept, and including whether the claim limitations are routine, well-understood, conventional, generic, existing, commonly used, well known, previously known, typical, and the like, including when viewed by one of ordinary skill in the art as of the April 2000 priority date which occurred over sixteen years ago. It would be inappropriate to grant judgment on the pleadings prior to the claims being construed and the court having the opportunity, during the claim construction process, to understand the patented invention, including in the context of evidence outside of the scope of a Rule 12(b) motion. *See Phoenix Licensing, v. CenturyLink,* 2015 WL 5786582, *2 (E.D. Tex. Sept. 29, 2015).

**D.     The '994 claims do not preempt any alleged abstract ideas.**

AT&T has failed to meet is burden of showing the claims of the '994 patent preempt any abstract ideas, including the erroneous and overbroad alleged abstract idea claimed by AT&T. Notably, AT&T does not even assert preemption. AT&T has provided no evidence or argument that preemption exists, other than a passing citation to *McRO*. Motion at 3. AT&T merely asserts, in conclusory fashion, that the '994 patent uses "generic computer terms" (Motion at 5) and comprises the use of a "generic computer 'computer system' to delay a portion of a data transmission" (Motion at 9), including that "[t]he limitations recited in Claim 1 relate to the most generic of computer systems" (Motion at 7). Such conclusory statements fall far short of "meaningfully address[ing] preemption," and fails to meet AT&T's burden. *Perdiemco,* 2016 WL 5719697 at *6; *See McRO*, 837 F.3d at 1315.

Further, at a minimum, no preemption is present with the subject claims due to the specific, meaningful, and novel limitations in the subject claims, as noted above. S*ee, e.g., France Telecom v.*

*Marvell Semiconductor*, 39 F.Supp.3d 1080, 1092 (N.D. Cal. 2014) ("Here, neither Claim 1 nor Claim 10 fully preempts the abstract idea of "error-correction coding" or "decoding digital data elements." … They are limited to one method for "error-correction coding of source digital data elements" and one method for "decoding" those data."). Nor do the '994 claims improperly inhibit further discovery by tying up building blocks of ingenuity or technological work. *Alice*, 134 S. Ct. at 2354-55.

It would be erroneous to conclude that the subject claims preempt the improper, overbroad, and oversimplified abstract idea identified by AT&T. The multiple limitations in each claim set forth above provide for specific apparatuses and electronic methods that is far narrower the erroneously overbroad abstract ideas alleged by AT&T. In its mischaracterization of the claimed inventions, AT&T created preemption where none existed by defining the claimed invention to encompass vast swaths of prior art. Motion at 13. A finding of preemption would lack any evidentiary basis.

Notwithstanding that AT&T's arguments involve disputed issues of fact, the claims are sufficiently limited to actual applications of the invention claimed and they do not preempt abstract ideas. The claims are specifically directed to methods, computer-readable media, and systems which use a programmed computer to perform the specific, concrete, and inventive steps notes above and in the Amended Complaint. Thus, the claims do not wholly preempt third parties from, *inter alia*, limiting transmissions and managing networks in other ways, including prior art methods, computer-readable media, or systems, including Kalkunte and Danneels. Nor do the claims wholly preempt third parties from, *inter alia*, delaying transmissions in other ways, including prior art methods, computer-readable media, or systems, including Kalkunte and Danneels. This therefore, is not like the claims in *Bilski*, which would have allowed the patentee to patent risk-hedging in general. *Bilski v. Kappos*, 130 S. Ct. 3218, 3231 (2010). Instead, the claims only foreclose others from use of the specific methods, computer-readable media, and systems specifically claimed and disclosed in the '994 patent. The actual claim elements do not preempt the hopelessly overbroad abstract ideas alleged

by AT&T. There is simply no evidence that the claims would preempt any field or grant Plaintiff a monopoly over an abstract idea.

**E.      The machine-or-transformation test supports patentability.**

As part of the holistic analysis required by *Bilski*, the machine or transformation ("MOT") test serves as a useful non-dispositive "investigative tool." *Bilski*, 130 S.Ct. at 3227. A machine "includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." *In re Ferguson*, 558 F.3d 1359, 1364 (Fed. Cir. 2009).

The MOT test further supports denial of the Motion. Under the Federal Circuit's broad definition of "machine," the "computers" that necessarily implement the steps of the claims are machines, including at least the first computer system and second computer system. The '994 claims satisfy the machine test, including because they are tied to a particular machine or apparatus, *e.g.,* a first and second computer system as claimed. *See SiRF Tech. v. ITC*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010). Further, the claimed invention cannot be performed without a machine, including because they cannot be practiced without the claimed computer systems. Contrary to AT&T's arguments that the use of a computer is merely "conventional", these machine aspects are central features of the invention and, accordingly, satisfied the "machine" prong of the machine-or-transformation test. Similarly, none of the '994 claims could be performed without a computer, including a computer performing each of the steps in each such claim. In addition to requiring complex programming, in each of the claim elements, the subject claims are also tied to a computer in a specific way and the computer "plays a significant part in permitting the [claims of the Patent-in-Suit] to be performed."[6]

**F.      Dismissal is inappropriate since the Complaint has enough facts to state a plausible claim.**

---

[6] Additionally, the claim limitations, when considered together, satisfy all four patentability criterion of *Alice*, even if the claims were otherwise directed to an abstract idea – they show: (i) an inventive concept, (ii) more than a drafting effort designed to monopolize the abstract idea; (iii) improving an existing technological process; and (iv) "a 'new and useful' application of the idea." *Alice,* 134 S. Ct. at 2357.

A multitude of fact issues preclude a finding of § 101 ineligibility at this stage. For example, there is at least a genuine issue of material fact as to whether the claimed invention involves only "well understood," "routine," or "conventional" activity. *See supra*. There are also genuine issues regarding the meanings of several claim terms that must be resolved before a ruling in favor of AT&T can be appropriate. Here, there are enough facts to state a claim to relief that is plausible on its face. Including when all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in favor of Plaintiff. This includes all of the factual allegations contained above, which alone provide multiple grounds requiring denial of AT&T's Motion. Plaintiff's Amended Complaint presents sufficient evidence of the validity of the '994 patent, including as discussed above. For example, there is a genuine issue as to whether the claimed systems and methods are conventional or generic computer components, per AT&T, or specific purpose devices, as Plaintiff contends here.

## IV.   RESPONSE TO 12(B)(6) MOTION REGARDING WILLFULNESS/ENHANCED DAMAGES

In view of Plaintiff's newly filed Amended Complaint, AT&T's complaints about Plaintiff's willfulness and/or enhanced damages allegations are moot. AT&T complained about the language in the Original Complaint. However, PrefNet has now filed an Amended Complaint, which is Doc No. 21. PrefNet's AmendComp, see ¶ 57, contains "enough factual matter" which, if taken as true, would "state a claim for relief that is plausible." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).

Irrespective of the mootness issue, the Amended Complaint is sufficient on post-suit willfulness. For example, in *Blitzsafe* this Court held post-suit willfulness allegations similar to those in ¶ 57, to be sufficient. *Blitzsafe Texas, LLC v. Volkswagen Group of America, Inc.*, 2016 WL 4778699, *6 (Aug. 19, 2016 E.D. Tex.). This Court held that "[t]he Complaint notifie[d] the VW Defendants of the patents that they are accused of infringing[, and] recites facts which state a plausible claim of direct and indirect infringement." *Id*. The same is applicable here. The Court went on to note that, with these valid, properly plead claims, that the allegations "that despite these facts, the VW

Defendants have not ceased their infringing activities…implies that acting in this manner is 'willful, wanton, malicious bad-faith, deliberate, consciously wrongful, flagrant, or [ ] characteristic of a pirate.'" *Id.* (citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016)). Thus, this Court found that, including under the new relaxed *Halo* standard for proving willfulness, "it is plausible to infer from these facts that the VW Defendants could be deliberately continuing to infringe despite notice they are infringing the asserted patents." *Id.* Here, AT&T has not, and cannot, assert Plaintiff's Amended Complaint fails to inform and allege direct infringement of the '994 patent. Further, under these facts, including as plead in the Amended Complaint, "Defendants are willfully and deliberately continuing to infringe the '994 patent despite being notified of the patent and their infringement of the patent[, and] Defendants' continuance of their clear and inexcusable infringement of the '994 patent post suit is willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, and/or characteristic of a pirate," that "such activities by Defendants qualifies this as an egregious case of misconduct beyond typical infringement, entitling Plaintiff to enhanced damages." AmendComp, ¶¶ 57-58.

Similarly, the *DermaFocus* court noted that while under some prior cases, "mere notice of the charge of infringement gleaned from service of the complaint [does not] pass muster for a willfulness claim[, the] less rigid standard announced in *Halo*" is not so harsh. *DermaFocus LLC v. Ulthera, Inc.*, No. 15-cv-654-SLR, 2016 WL 4263122, *6 (D. Del. Aug. 11, 2016).  Thus, under the "less rigid standard," the court "allow[ed] plaintiff's general allegations of willful infringement to withstand the motion to dismiss." *Id.*; *See also Simplivity Corp. v. Springpath, Inc.*, C.A. NO. 4:15–13345–TSH, 2016 WL 5388951, *18 & n.32 (D. Mass. July 15, 2016).

Some district Courts have previously ruled that pre-suit knowledge or a motion for preliminary injunction are necessary to maintain a claim for post-suit willfulness, but those cases are no longer good law under *Halo's* lower bar for willfulness. The willfulness allegations in Plaintiff's Amended

Complaint are substantively the same as those upheld in the *Blitzsafe* case.  Plaintiff's claims for post-suit willfulness and for enhanced damages flowing therefrom are well-plead enough to withstand AT&T's Motion. Thus, to the extent the Court does not find it moot, AT&T's Motion on this basis should be denied.

## V.    "RESPONSE" TO PURPORTED FRCP 12(B)(3) MOTION

AT&Ts' purported FRCP 12(b)(3) motion purports to reserve rights to move to transfer venue if controlling law is modified by the Supreme Court. PrefNet opposes such reservation and it opposes any transfer of venue as being unfounded. Since AT&T's purported motion appears to be an attempted place-holder at best, it does not appear necessary to respond to it substantively at this time, other than stating PrefNet's opposition to any such relief.

## VI.    CONCLUSION

The facts alleged in the Amended Complaint (*see* above) and apparent from the text and and/or prosecution history of the '994 patent, which the Court must accept as true on a Rule 12(b)(6) motion, require denial of AT&T's Motion, including when all reasonable inferences are drawn in favor of Plaintiff. Including because AT&T has failed to meet its heavy burden for dismissal at on Rule 12 motion, and due to the disputed factual issues – including whether the claimed inventions were "routine," "conventional," etc. over sixteen years ago; and whether the claims preempt any abstract ideas – noted herein; and for the other reasons stated herein, AT&T's Motion must be denied.

February 13, 2017                                  Respectfully submitted,

                                                   /s/ *John J. Edmonds*
                                                   John J. Edmonds – Lead Counsel
                                                     jedmonds@ip-lit.com
                                                     Texas Bar No. 789758
                                                   Stephen F. Schlather
                                                     sschlather@ip-lit.com
                                                     Texas Bar No. 24007993
                                                   Shea N. Palavan
                                                     spalavan@ip-lit.com

Texas Bar No. 24083616
Brandon G. Moore
    bmoore@ip-lit.com
    Texas Bar No. 24082372
Eric R. Carr
    ecarr@ip-lit.com
    Texas Bar No. 24091261
**COLLINS, EDMONDS,**
**SCHLATHER & TOWER, PLLC**
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: (281) 501-3425
Facsimile: (832) 415-2535

*Attorneys for Plaintiff,*
*Preferential Networks IP, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

February 13, 2017                             John J. Edmonds